**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TINA CARR and YVETTE COLON,<br><br>        Plaintiffs,<br><br>    v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of the U.S. Department of Education, and NAVIENT CORPORATION,<br><br>        Defendants. | Case No.: 17-cv-8790<br><br><br>**COMPLAINT FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      Plaintiffs Tina Carr and Yvette Colon borrowed student loans from the Department of Education (the Department) and Sallie Mae Bank (Sallie Mae), the predecessor in interest of Navient Corporation (Navient), to attend Sanford-Brown Institute (Sanford-Brown or SBI), a notoriously abusive for-profit college operated by Career Education Corporation (CEC) in New York.

2.      Sanford-Brown grossly misrepresented its career training programs and Plaintiffs' employment prospects to induce Plaintiffs to enroll, remain enrolled, and later enroll in further programs. Plaintiffs did not receive any of the promised benefits of attending Sanford-Brown, and in fact, their careers and lives have been severely harmed by their attendance and the crushing student loan debt that resulted from it.

3.      The Office of the Attorney General of the State of New York (OAG) found that Sanford-Brown systematically made the same types of false and deceptive representations to other prospective students that it made to Plaintiffs, in violation of New York consumer protection law.

4.      The promissory notes that Plaintiffs signed when they borrowed student loans to attend Sanford-Brown give them the right to assert claims based on Sanford-Brown's misconduct against the entities that hold their loans—the Department, under the direction of Defendant Elisabeth DeVos, and Navient.

5.      Plaintiffs invoked this right to cancellation of their loans by submitting to the Department and Navient evidence of Sanford-Brown's misconduct. But to date Defendants have refused to recognize Plaintiffs' right to have their defenses considered, and have instead asserted an unfettered right to collect from Plaintiffs.

6.      Plaintiffs are experiencing harm from these unlawful loans in the form of damaged credit and actual or threatened collections, including the possibility of future collection litigation.

7.      Plaintiffs therefore seek an immediate adjudication of their defenses to repayment of the loans in this forum.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 20 U.S.C. § 1082(a)(2); 28 U.S.C. § 1331; 28 U.S.C. §§ 2201-2202; and 28 U.S.C. § 1367.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)(B)-(C) because one of the Plaintiffs resides in this district, and because a substantial part of the events giving rise to these claims occurred in this district.

## PARTIES

10.      Plaintiff Tina Carr lives in Lindenhurst, New York. Ms. Carr borrowed federal student loans to attend a Medical Assisting program at Sanford-Brown's Melville, New York campus.

11.     Plaintiff Yvette Colon lives in New York, New York. Ms. Colon borrowed federal and private student loans to attend a Non-Invasive Cardiovascular Technology (Sonography) program at Sanford-Brown's New York, New York campus.

12.     Defendant Elisabeth DeVos is the Secretary of the United States Department of Education (the Secretary).

13.     In her official capacity, the Secretary oversees all operations of the Department and the administration of federal student loan programs, including the Federal Family Education Loan (FFEL) and Direct Loan programs, and has the ultimate duty and power to collect, discharge, cancel, settle, or compromise federal student loans. Specifically, the Secretary's duties and powers include:

a)     dictating the form and content of federal student loan Master Promissory Notes;

b)     issuing student loans through the Direct Loan program;

c)     approving the participation of lenders, including Sallie Mae, in the FFEL program;[1]

d)     determining which schools and programs are eligible to receive federal student loan proceeds;

e)     collecting on federal student loans held by the Department, including collecting on defaulted loans through litigation, garnishment of wages, offset of public benefits, and seizure of federal income tax refunds;

f)     entering into contracts with student loan servicers, such as Defendant Navient, and private collection agencies in order to collect on federal student loans;

---

[1] No new loans can be made under the FFEL program, effective July 1, 2010. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-151, § 2201 *et seq., * 124 Stat. 1074 *et seq*. (2010).

g)      setting standards for and supervising the collection of federal student loans
held by other entities; and

h)      specifying in regulations when federal student loan borrowers may assert
school misconduct as a defense to repayment.

14.      The Department, under Defendant DeVos, currently holds Ms. Carr's Direct
Loans, and has the right to assignment of, and ultimate repayment on, Ms. Colon's FFEL loans.

15.      Defendant Navient Corporation is a Delaware corporation with its principal place
of business located at 123 Justison Street, Wilmington, Delaware 19801.

16.      In April 2014, Navient assumed responsibility for liabilities resulting from the
conduct of its predecessor, SLM Corporation, and Sallie Mae Bank, a subsidiary of SLM
Corporation. Included in the liabilities assumed by Navient are those relating to the loan
origination conduct described in this Complaint.

17.      Allegations in this Complaint made against Sallie Mae are thus attributable to and
therefore also made against Navient.

18.      Sallie Mae was the lender, and Navient is the holder and servicer, of Ms. Colon's
FFEL and private student loans.

**FACTUAL ALLEGATIONS**

*Tina Carr's Enrollment at Sanford-Brown*

19.      After spending over two decades working as a professional musician, Ms. Carr
moved from Los Angeles to New York in 2008 to help take care of her mother, who had been
diagnosed with cancer.

20.      Participation in her mother's treatment led Ms. Carr to consider a second career in
the medical field.

4

21.     At the time, Ms. Carr had only her high school diploma and a few college credits.

22.     Ms. Carr decided to obtain a professional license in the medical field, with the ultimate goal of becoming a registered nurse. As a first step, she decided to become credentialed in medical assisting, then gain additional hands-on work experience before pursuing further professional studies.

23.     She considered a number of programs offered by different institutions in her area, including ones offered at public, nonprofit schools.

24.     Ms. Carr first became aware of SBI's Medical Assisting program in early 2011 through a radio advertisement, which touted SBI's success in placing its graduates in relevant jobs.

25.     To learn more about SBI's program at the Melville location, Ms. Carr visited SBI's website. The information there reinforced the job placement information promoted in SBI's radio advertisement, and also advertised SBI's "Career Placement Assistance Services" and its "career-focused education."

26.     On January 26, 2011, Ms. Carr went to SBI for what she thought would be an admissions interview.

27.     Instead, she met with an SBI admissions representative who promoted SBI to Ms. Carr. The SBI representative told Ms. Carr that if she studied hard, there was "a promise of employment" as a medical assistant.

28.     The SBI representative told Ms. Carr that Sanford-Brown had an approximately 80 percent job placement rate, and that placement rates for diligent students were even higher.

29.     The 80 percent job placement rate that the SBI representative stated to Ms. Carr was completely fabricated.

30.     The actual placement rate for SBI-Melville graduates in 2009-2010, shortly before Ms. Carr enrolled, was 26.1 percent.

31.     Ms. Carr told the SBI representative that she hoped to pursue a degree as a registered nurse after she had completed the Medical Assisting program and had worked as a medical assistant.

32.     The SBI representative told Ms. Carr that she would secure a job as a medical assistant, and that once she did, her future employer would likely pay for her further education, including a bachelor's degree and nursing school.

33.     The SBI representative failed to disclose to Ms. Carr that SBI's credits were not transferable to most public and non-profit degree-granting educational institutions.

34.     The SBI representative's pitch was intended to, and did, make Ms. Carr think that if she attended SBI, she would find a job as a medical assistant, and that she could later transfer her SBI credits to other institutions to pursue future studies to become a registered nurse.

35.     The SBI representative's statements convinced Ms. Carr to enroll in SBI's Medical Assisting certificate program, rather than in a Medical Assisting program at any of the other schools Ms. Carr had considered.

36.     Ms. Carr began her coursework at Sanford-Brown in March 2011.

37.     During Ms. Carr's attendance, the Campus Director of Education repeated unfounded claims that SBI would place students in jobs after they completed their coursework.

38.     After Ms. Carr had been in the program for approximately three months, SBI representatives encouraged Ms. Carr to switch to the Medical Assisting associate degree program, telling her that it would provide better career opportunities. The associate degree program was longer and more expensive than the Medical Assisting certificate program in which

she initially enrolled.

39.     SBI representatives told Ms. Carr that she would earn more, and could earn up to $60,000 per year as a medical assistant with an associate degree and that Ms. Carr's externship experiences would lead to a permanent job. Ms. Carr borrowed additional loans in order to complete the associate degree program.

40.     Both of these representations were false.

41.     In order to attend Sanford-Brown, Ms. Carr borrowed six federal Direct Loans totaling $14,576. Ms. Carr executed Master Promissory Notes for these loans.

42.     Ms. Carr obtained these loans in reliance upon SBI's assurance that she would obtain a well-paying job upon graduation and its misrepresentations as to its job placement rates and the transferability of its credits.

43.     SBI made misrepresentations and material omissions to Ms. Carr regarding the school's ability to place graduates in jobs, the salary she would earn in such jobs, the support it would provide her in securing post-graduate employment, and the transferability of SBI credits to other programs. On information and belief, the SBI representatives who made these representations knew or should have known that they were false, and nonetheless made the representations to induce Ms. Carr to enroll at Sanford-Brown and remain enrolled.

44.     Ms. Carr graduated from SBI in October 2012 with an associate degree in Medical Assisting.

45.     Despite graduating with a 4.0 grade point average, Ms. Carr was not able to get a job after her externships. Ms. Carr sought the promised job placement assistance from Sanford-Brown's career services staff, but they did not help her to secure even a single interview.

46.     Ms. Carr diligently conducted her own job search, but could not find employment

with her Sanford-Brown credential.

47.     Since attending Sanford-Brown, Ms. Carr has never been able to obtain a job as a medical assistant, or any other job in the medical field.

48.     After months of searching unsuccessfully for employment as a medical assistant, Ms. Carr began to apply for jobs outside of her field. Ms. Carr experienced a period of homelessness and needed a steady source of income. In late 2013, she was hired as a seasonal cashier at J.C. Penney, where she worked for almost four years.

49.     Ms. Carr had high hopes for her future career prospects when she first began attending Sanford-Brown. She proudly told her friends and relatives that she was embarking on a new career. But when Ms. Carr was unable to find a job after finishing her degree, she experienced severe psychological trauma. She withdrew from her friends and relatives, and was unable to function normally. Ms. Carr remained in this traumatized state for months.

50.     Ms. Carr's federal loans have gone into default because she has been unable to afford payments. Her loans have an outstanding balance of $18,590.

51.     Saddled with debt she cannot pay and a degree she cannot use, Ms. Carr has experienced homelessness, and has seen her credit ruined and her car repossessed.

***Yvette Colon's Enrollment at Sanford-Brown***

52.     After working in the medical field for many years as a medical assistant and receptionist, Ms. Colon sought to advance her career by becoming a cardiac sonographer.

53.     In 2006, Ms. Colon sought to enroll in a cardiac sonography program. Ms. Colon had been advised by a colleague to be careful in choosing a program because not all schools offering such programs are accredited.

54.     Ms. Colon met with an SBI representative at SBI's New York, New York campus

to ask whether the program was accredited for cardiac sonography. The SBI representative said "Oh yes, we are accredited." The representative pointed to a plaque on the wall, which had the word "accredited" on it.

55.     SBI's representation that its sonography program was accredited was false. In fact, SBI's sonography program lacked the necessary programmatic accreditation that would allow Ms. Colon to work as a sonographer. This program did not have, and never had, the required accreditation.

56.     Ms. Colon met with another SBI representative who told her that, after the program, she would definitely get a job as a sonographer and would earn $50,000 to $60,000 per year. These representations were false.

57.     The industry-standard American Registry for Diagnostic Medical Sonography (ARDMS) test is a *de facto* requirement for employment in the field of sonography. To take the exam, applicants must either graduate from a course with programmatic accreditation (the accreditation that SBI's program lacked), or work in the field for one year—which SBI's graduates could not do because employers were unwilling to hire individuals who had not passed the ARDMS exam. According to the OAG, graduates of SBI's sonography program thus faced a "'[c]atch 22,'" in that most employers require certification, but without the programmatic accreditation, the only other path to certification requires a year of employment. *In re* Career Educ. Corp., AOD No. 13-379, Assurance of Discontinuance (Aug. 19, 2013) (Assurance), at 10-11.

58.     Ms. Colon decided to enroll in SBI's Non-Invasive Cardiovascular Technology (Sonography) certificate program based on the representatives' statements that the program was accredited and that she would definitely be able to get a job as a sonographer after graduation.

59.     Ms. Colon began coursework at Sanford-Brown in New York City in September 2006.

60.     During Ms. Colon's enrollment at SBI, SBI representatives told her that her credits would transfer to an associate degree program.

61.     Toward the end of her first year, Ms. Colon and her classmates heard that graduating students were unable to sit for the ARDMS certification examination. Alarmed, Ms. Colon's classmates raised their concerns with the Director of Sanford-Brown's Non-Invasive Cardiovascular Technology Program. The Director assured Ms. Colon and her classmates that their program was in the process of obtaining accreditation—and that even if it did not, Ms. Colon and her classmates' upcoming internships would lead to ultrasound jobs, which would make them eligible to take the certification examination after one year of work in the field. Based on these assurances, Ms. Colon decided to remain enrolled.

62.     Ms. Colon completed two externships while enrolled at Sanford-Brown, neither of which led to a job. Ms. Colon was part of the first, and—because of its lack of training—last, Sanford-Brown cohort to extern at New York University. Her supervisor repeatedly commented on the Sanford-Brown externs' poor preparation for clinical work.

63.     In April 2008, Ms. Colon graduated from Sanford-Brown with a certificate in Non-Invasive Cardiovascular Technology (Sonography).

64.     When she attempted to register for the ARDMS exam, ARDMS informed her that she could not sit for the exam because she had not graduated from an accredited sonography program.

65.     Although Ms. Colon diligently searched for a sonography job, no employer would hire her unless she passed the ARDMS exam.

66.     Ms. Colon called Sanford-Brown regularly for months to ask if they knew of any available jobs, but in all that time they gave her only one referral to a job interview. It did not lead to a job offer.

67.     Ms. Colon could not find work in the cardiac sonography field. She eventually returned to a job in medical billing.

68.     In 2008, Ms. Colon tried to transfer her credits to the Borough of Manhattan Community College (BMCC), but BMCC informed her that the credits would not transfer because SBI's program did not have the right accreditation.

69.     The Sanford-Brown representatives' repeated promises that Ms. Colon's credits were transferable were false.

70.     SBI representatives made misrepresentations to Ms. Colon regarding the sonography program's accreditation, job placement assistance, and transferability of credits. On information and belief, the SBI representatives who made these representations knew or should have known that they were false, and nonetheless made the representations to induce Ms. Colon to enroll at Sanford-Brown and remain enrolled.

71.     To attend Sanford-Brown, Ms. Colon borrowed from Sallie Mae four FFEL loans, totaling $14,838, and two private loans, totaling $21,095.

72.     At the time of Ms. Colon's attendance, Sallie Mae was a preferred lender of CEC, the parent company that operated SBI.

73.     CEC dictated all of SBI's financial aid and admissions practices.

74.     Pursuant to this preferred lending relationship, SBI referred its students, including Ms. Colon, to Sallie Mae. SBI led Ms. Colon to believe that private loans from Sallie Mae were the only option for her to fund the cost of her program not covered by federal loans.

75.     This preferred lending relationship benefited Sallie Mae by giving the company near-exclusive access to a large volume of risk-free federal student loans. It also benefited SBI, because in order to obtain preferred lender status, Sallie Mae agreed with CEC to offer subprime private student loans to students at CEC schools, including SBI.

76.     These subprime private loans helped SBI meet the federal requirement that, as a for-profit school, it derive at least 10 percent of its revenue from sources other than federal student aid (the "90/10" rule). *See* 20 U.S.C. § 1094(a)(24).

77.     Meeting the "90/10" rule's requirement was difficult for SBI, because many of its students could not afford even 10 percent of its high tuition out-of-pocket.

78.     In addition, Sallie Mae knew that many of the SBI students referred to Sallie Mae to borrow private loans would default on those loans because of the low graduation and employment rates of SBI students.

79.     In fact, Sallie Mae and CEC entered into a "recourse agreement," under which CEC was required to deposit 20 percent of proceeds of these loans directly into a Sallie Mae reserve account to mitigate Sallie Mae's expected losses from these loans.

80.     Ms. Colon borrowed in reliance upon SBI's misrepresentations as to its programmatic accreditation, the transferability of its credits, its assurance that she would obtain a well-paying job upon graduation, as well as SBI's later misrepresentations that her credits would transfer, her externship would lead to a job, and the program would become accredited in time for her to sit for the ARDMS exam.

81.     Ms. Colon has paid thousands of dollars on her federal and private loans.

82.     Ms. Colon's private loans are in default and are subject to active collections.

83.     As a result of carrying debt she cannot repay, Ms. Colon's dreams of owning a

home have been dashed. Her credit has been severely damaged, and she was only able to obtain a car loan at a very high interest rate. She has never worked in the sonography field, and she relies on friends and family for financial support.

***Findings of SBI Misconduct by the Office of the Attorney General of the State of New York***

84.     After conducting a years-long investigation into SBI's business practices, the OAG determined that SBI systematically made false and deceptive representations to prospective and enrolled students, in violation of the consumer protection provisions of New York General Business Law Sections 349 and 350.

85.     The OAG's investigation culminated in an Assurance of Discontinuance with CEC, the parent company that operated SBI.

86.     The OAG found that from approximately 2008 to 2011, CEC misrepresented SBI's job placement rates, SBI's accreditation status, and the transferability of SBI credits— precisely the categories of misrepresentations that induced Ms. Carr and Ms. Colon to enroll and remain enrolled at SBI.

87.     On information and belief, the illegal conduct described in the Assurance, including misrepresentations and deception concerning job placement rates, transferability of credits, and programmatic accreditation occurred at relevant times prior to 2008.

88.     Ms. Carr and Ms. Colon were subject to the practices described in the OAG's findings.

89.     The OAG found that "CEC provided inaccurate and inflated placement rates to prospective and then current students" at SBI and other CEC schools. Assurance at 4. Specifically, the OAG found that

> [s]tudents choose to attend CEC and select particular programs at CEC in order to improve their employment opportunities. Accordingly, placement rate is an

13

important factor in students' decision to enroll in and complete CEC programs. The placement rates for [CEC] New York schools disclosed to prospective and then current students during the period of 2009 through spring 2011 were significantly inflated, giving prospective students a distorted, significantly overly-favorable impression of CEC graduates' employment outcomes.

*Id.* at 6-7.

90.    The OAG found that SBI's New York, New York campus (where Ms. Colon attended) represented to students that it had a placement rate of 65.7 percent in 2008-2009, but the actual rate was 42.1 percent. *Id.* at 7.

91.    The OAG further found that SBI's Melville, New York campus (where Ms. Carr attended) represented to students that it had a 70 percent placement rate in the 2009-2010 cohort, but the actual rate was 26.1 percent. *Id.*

92.    The OAG found that CEC's schools, including SBI, used deceptive means to inflate its job placement statistics, including counting students who worked at one-day health fairs as employed; requesting health companies to sponsor health fairs so that large numbers of CEC graduates could be considered employed; and placing false information regarding students' job responsibilities into student files so that students could be counted as employed within their field of study. *Id.* at 5-6.

93.    With respect to programmatic accreditation, the OAG found that

CEC enrollment representatives failed to adequately disclose to prospective and current students that [certain health services] programs were not programmatically accredited; that graduates of these unaccredited programs could not sit for certain qualifying exams typically necessary for employment upon graduation; and that graduates' inability to sit for these exams could negatively affect their employment opportunities.

*Id.* at 11.

94.    With respect to transfer credits, the OAG found that "CEC enrollment representatives," including representatives at SBI, "fail[ed] to adequately disclose to prospective

students that credits earned at CEC's nationally-accredited programs are unlikely to be accepted by most regionally accredited public non-profit degree granting educational institutions." *Id.* at 13.

95.     The OAG determined that these deceptive practices violated New York General Business Law Sections 349 and 350. *Id.* at 14.

96.     In accepting the Assurance, CEC agreed to pay over nine million dollars into a restitution fund. *See id.* at 36.

97.     On October 24, 2014, Ms. Colon, who enrolled in 2006, received a notice from the OAG that she was eligible for a restitution payment. Ms. Colon applied for restitution from this fund, and was awarded $3,094.93.

98.     Ms. Carr was eligible for a restitution payment under the terms of the Assurance, but did not receive the notice.

***Defendants Are Subject to Plaintiffs' State Law Claims Against SBI***

99.     The terms of the promissory notes that Ms. Carr and Ms. Colon executed when they took out loans to attend Sanford-Brown allow them to assert state law claims based on SBI's misconduct against Defendants DeVos and Navient, the entities that hold the loans.

100.     The Federal Trade Commission's longstanding Rule on Preservation of Consumers' Claims and Defenses (referred to as the "Holder Rule") prevents creditors from profiting from illegal consumer practices while insulating themselves from consumer claims and defenses against sellers.

101.     The Holder Rule allows consumers to raise seller-related claims against any holder of their credit agreements by requiring all covered entities, including for-profit colleges, to include the following language in every credit agreement:

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO
ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT
AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED
PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY
HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID
BY THE DEBTOR HEREUNDER.

*See* 16 C.F.R. § 433.2; *see also* 40 Fed. Reg. 53,506, 53,524 (Nov. 18, 1975).

102.     Through the Holder Rule, a student loan borrower can assert against any holder of

her private student loan any claim or defense that she could assert against her school.

103.     Ms. Colon's private student loan notes contain the Holder Rule language quoted

above. This language allows her to assert SBI's misconduct against Navient, the holder of her

private student loans.

104.     Federal student loan notes contain language modeled on the Holder Rule that

gives a student loan borrower the right to assert her school's misconduct as a defense to

repayment of her student loan.

105.     Specifically, FFEL Master Promissory Notes (MPNs) provide:

If this loan is made by the school, or if the proceeds of this loan are used to pay
tuition and charges of a for-profit school that refers loan applicants to the lender,
or that is affiliated with the lender by common control, contract or business
arrangement, any holder of this Note is subject to all claims and defenses which I
could assert against the school. My recovery under this provision shall not exceed
the amount I paid on this loan.

*See also* 34 C.F.R. 682.209(g).

106.     Ms. Colon's FFEL MPNs contain the above-quoted language, which allows her to

assert SBI's misconduct against Navient, the holder of her federal student loans. Ms. Colon can

also assert her defenses against Defendant DeVos because the Department of Education has the

ultimate liability for FFEL loans, an ongoing obligation to collect FFEL loans, the ability to

compromise and cease collection of FFEL loans, the ability to demand assignment to itself of

FFEL loans, and the authority to discharge Ms. Colon's FFEL loans.

107.    Direct Loan MPNs provide:

In some cases, you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done. You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law.

*See also* 20 U.S.C. § 1087e(h); 34 C.F.R. 685.206(c)(1).

108.    Although FFEL and Direct Loan MPNs contain different language, the borrower's ability to assert defenses to repayment are coextensive. *See, e.g.*, 20 U.S.C. § 1087e(a)(1); 60 Fed. Reg. 37,768, 37,769 (July 21, 1995).

109.    Ms. Carr's Direct Loan MPNs contain the language quoted above, which allows her to assert SBI's misconduct against the Department, under the direction of Defendant DeVos, the holder of her federal student loans.

110.    The language in the MPNs executed by Ms. Carr and Ms. Colon allows them to assert claims against the loan holders arising out of state law, including New York General Business Law § 349(a) and common law fraud.

111.    New York General Business Law Section 349(a) prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

112.    New York common law fraud prohibits any material misrepresentation or omission of fact made with knowledge of its falsity and with an intent to defraud, on which a plaintiff reasonably relies, that causes damage to the plaintiff.

***Plaintiffs' Need for Declaratory Judgment Relief***

113.    For nearly three years, Ms. Carr and Ms. Colon have asserted to Defendants that

17

they have state law claims against Sanford-Brown that give rise to defenses to repayment of their student loans.

114.    Defendants have refused to consider the merits of Plaintiffs' defenses and have instead maintained that they have the right to collect on Plaintiffs' loans.

115.    On March 18, 2015, Ms. Carr asserted to the Department and its collection agency, FMS Investment Corporation, a complete defense to repayment of her federal loans based on Sanford-Brown's violations of New York law. Ms. Carr submitted a letter articulating her defense, a sworn affidavit setting forth the misconduct described above at ¶¶ 23-47, and nearly 100 pages of exhibits, including OAG evidence documenting Sanford-Brown's misconduct.

116.    On April 10, 2015, the Department's Default Resolution Group responded to Ms. Carr's submission by stating that a school's misrepresentations could not provide a legal basis for a borrower to be relieved of the obligation to repay her federal loans. The letter further stated that "Ms. Carr is responsible for repayment of this debt" and that she "may be subject to enforced collection actions including wage garnishment and lawsuit."

117.    The Department placed Ms. Carr's loans in a "stopped collection" status at the Department's sole discretion. The Department has taken no further action on Ms. Carr's submission.

118.    On March 9, 2015, Ms. Colon asserted to the Department's Ombudsman and Navient complete defenses to the repayment of her FFEL loans based on Sanford-Brown's violations of New York law. Ms. Colon submitted a letter articulating her defense, a sworn affidavit setting forth the misconduct described above at ¶¶ 52-75, and over 100 pages of exhibits, including OAG evidence documenting Sanford-Brown's misconduct.

119.     On April 24, 2015, Navient responded to Ms. Colon's federal loan submission by stating that her FFEL loans could only be forgiven upon death or disability, or a school's closure. The letter further provided various options for repayment, deferment, and forbearance.

120.     Navient has placed Ms. Colon's FFEL loans in forbearance at its discretion.

121.     The Department has repeatedly delayed implementation of a final rule that would guide the Department's processing of borrower defense claims on non-defaulted loans. *See* U.S. Department of Education, Notification of Partial Delay of Effective Dates, 82 Fed. Reg. 27,621 (June 16, 2017); U.S. Department of Education, Interim Final Rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 82 Fed. Reg. 49,114 (Oct. 24, 2017).

122.     On February 5, 2016, Ms. Colon raised the same grounds to Navient as a complete defense to repayment of her private loans under the terms of her promissory notes and federal law.

123.     On August 19, 2016, Navient responded to Ms. Colon's private loan submission and stated that it would "make no comment on whether Ms. Colon is entitled to relief from repayment of her Navient-owned private student loans based on the FTC Holder Rule." It stated that FTC Holder Rule "claims and defenses must be asserted and proven with competent evidence in an appropriate legal action."

124.     Ms. Colon's private loans remain in default and subject to active collections.

125.     Plaintiffs have been, and continue to be, harmed by Defendants' failure to recognize their defenses to repayment.

126.     All of Ms. Carr's and Ms. Colon's loans remain on their credit reports,

significantly harming their credit. This has impaired their ability to rent or buy homes and to buy cars.

127.    Because the Department and Navient have asserted an unfettered right to payment on Plaintiffs' federal loans, Plaintiffs face the threat of resumed collection activity on these loans by Defendants at any time, including the threat of collection litigation.

128.    If and when Defendants resume collection on those loans, Plaintiffs will be forced to make payments on loans they assert they do not owe, attempt to negotiate a deferment or forbearance that temporarily relieves them of the obligation of making payments, or be in default on their loan obligations.

129.    When borrowers default on federal loans, they are subject to coercive collection mechanisms, including wage garnishment and tax offset. They are also subject to collections litigation.

130.    Plaintiffs' federal loans have no statute of limitations. All of Plaintiffs' student loans are presumptively non-dischargeable in bankruptcy.

131.    Without adjudication of their claims, Ms. Carr's and Ms. Colon's student loans will follow them for the rest of their lives.

132.    Therefore, Ms. Carr and Ms. Colon seek declaratory relief establishing that they have complete defenses to their repayment obligations.

### CAUSES OF ACTION
*Count One, Against Defendant DeVos:*
*Declaratory Judgment That Plaintiff Carr's Federal Direct Loans Are Unenforceable*

133.    Plaintiffs repeat and reallege each of the foregoing paragraphs, as if fully set forth herein.

134.    SBI's conduct violated New York General Business Law Section 349(a) because:

a) SBI engaged in deceptive acts and practices in the conduct of its businesses;

b) SBI's conduct has had a broad impact on consumers at large;

c) SBI committed the deceptive acts and practices willfully and/or knowingly; and

d) SBI's wrongful and deceptive acts have caused injury and damages to Ms. Carr.

135.    SBI's conduct constituted common law fraud under New York law because:

a) SBI made material misrepresentations and omissions of fact with knowledge of their falsity;

b) SBI made such misrepresentations and omissions with intent to defraud;

c) Ms. Carr reasonably relied on SBI's misrepresentations and omissions of fact; and

d) Ms. Carr has suffered resulting damage.

136.    SBI's conduct toward Ms. Carr that violates New York General Business Law Section 349 and constitutes common law fraud includes, but is not limited to:

a) SBI's representation to Ms. Carr that the job placement rate at SBI-Melville was 80 percent;

b) SBI's representation to Ms. Carr that if she studied hard, there was "a promise of employment";

c) SBI's failure to disclose to Ms. Carr that her credits were not transferable to most public and non-profit degree granting educational institutions;

d) SBI's representation to Ms. Carr that she would earn more, and could earn up to $60,000 per year as a medical assistant with an associate degree; and

e) SBI's representation to Ms. Carr that her externship experiences would lead to a permanent job.

137.    Ms. Carr has suffered damages from SBI's wrongful and unlawful conduct in an

amount equal to or greater than the amount of money she has paid plus the outstanding principal, interest, and fees on these loans. Moreover, she has experienced homelessness, mental anguish, and trauma. Her credit has been severely harmed and her car repossessed.

138.    Under the terms of Ms. Carr's Master Promissory Notes, SBI's violations of New York law constitute a defense to repayment of Ms. Carr's federal student loans.

139.    Ms. Carr seeks a declaration that she has, pursuant to federal statute, regulation, and the terms of her Master Promissory Notes, established a defense to her repayment obligations such that her federal student loans are unenforceable.

### Count Two, Against Defendants DeVos and Navient: Declaratory Judgment That Plaintiff Colon's Federal FFEL Loans Are Unenforceable

140.    Plaintiffs repeat and reallege each of the foregoing paragraphs, as if fully set forth herein.

141.    SBI's conduct violated New York General Business Law Section 349(a) because:

  a)  SBI engaged in deceptive acts and practices in the conduct of its businesses;

  b)  SBI's conduct has had a broad impact on consumers at large;

  c)  SBI committed the deceptive acts and practices willfully and/or knowingly; and

  d)  SBI's wrongful and deceptive acts have caused injury and damages to Ms. Colon.

142.    SBI's conduct constituted common law fraud under New York law because:

  a)  SBI made material misrepresentations and omissions of fact with knowledge of their falsity;

  b)  SBI made such misrepresentations and omissions with intent to defraud;

  c)  Ms. Colon reasonably relied on SBI's misrepresentations and omissions of fact; and

  d)  Ms. Colon has suffered resulting damage.

143. SBI's conduct toward Ms. Colon that violates New York General Business Law Section 349 and constitutes common law fraud includes, but is not limited to:

    a) SBI's representation to Ms. Colon that its sonography program was accredited;

    b) SBI's representation to Ms. Colon that she would definitely get a job as a sonographer;

    c) SBI's representation to Ms. Colon that she would earn $50,000 to $60,000 per year as a sonographer;

    d) SBI's representation to Ms. Colon that her externship experiences would lead to a permanent job;

    e) SBI's representation to Ms. Colon that it would become accredited in time for her to sit for the ARDMS exam; and

    f) SBI's failure to disclose to Ms. Colon that her credits were not transferable to most public and non-profit degree granting educational institutions.

144. Ms. Colon has suffered damages from SBI's wrongful and unlawful conduct in an amount equal to or greater than the amount of money she has paid plus the outstanding principal, interest, and fees on these loans. Moreover, her credit has been harmed, raising the cost of her car loan, and she has been subject to collections on her defaulted private student loans.

145. Under the terms of Ms. Colon's Master Promissory Notes, SBI's violations of New York law constitute a defense to repayment of Ms. Colon's federal student loans.

146. Ms. Colon can assert her defenses against Sallie Mae's successor in interest, Defendant Navient, because the relationship between Sallie Mae and SBI meets one or more of the following criteria:

    a) Sallie Mae was an organization affiliated with SBI;

b) Sallie Mae provided an improper inducement to SBI in connection with the making of the loan;

c) SBI referred Ms. Colon to Sallie Mae; and

d) SBI is affiliated with Sallie Mae by contract and/or business arrangement.

147.   Ms. Colon can also assert her defenses against Defendant DeVos because the Department of Education has the ultimate liability for FFEL loans, an ongoing obligation to collect FFEL loans, the ability to compromise and cease collection of FFEL loans, the ability to demand assignment of her FFEL loans, and the authority to discharge Ms. Colon's FFEL loans.

148.   Ms. Colon seeks a declaration that she has, pursuant to federal statute, regulation, and the terms of her Master Promissory Notes, established a defense to her repayment obligations such that her FFEL loans are not enforceable.

### Count Three, Against Defendant Navient: Declaratory Judgment That Plaintiff Colon's Private Loans Are Unenforceable

149.   Plaintiffs repeat and reallege each of the foregoing paragraphs, as if fully set forth herein.

150.   SBI's conduct violated New York General Business Law Section 349(a) because:

a) SBI engaged in deceptive acts and practices in the conduct of its businesses;

b) SBI's conduct has had a broad impact on consumers at large;

c) SBI committed the deceptive acts and practices willfully and/or knowingly; and

d) SBI's wrongful and deceptive acts have caused injury and damages to Ms. Colon.

151.   SBI's conduct constituted common law fraud under New York law because:

a) SBI made material misrepresentations and omissions of fact with knowledge of their falsity;

b) SBI made such misrepresentations and omissions with intent to defraud;

c) Ms. Colon reasonably relied on SBI's misrepresentations and omissions of fact; and

d) Ms. Colon has suffered resulting damage.

152.    SBI's conduct toward Ms. Colon that violates New York General Business Law Section 349 and constitutes common law fraud includes, but is not limited to:

a) SBI's representation to Ms. Colon that its sonography program was accredited;

b) SBI's representation to Ms. Colon that she would definitely get a job as a sonographer;

c) SBI's representation to Ms. Colon that she would earn $50,000 to $60,000 per year as a sonographer;

d) SBI's representation to Ms. Colon that her externship experiences would lead to a permanent job;

e) SBI's representation to Ms. Colon that it would become accredited in time for her to sit for the ARDMS exam; and

f) SBI's failure to disclose to Ms. Colon that her credits were not transferable to most public and non-profit degree granting educational institutions.

153.    Ms. Colon has suffered damages from SBI's wrongful and unlawful conduct in an amount equal to or greater than the amount of money she has paid plus the outstanding principal, interest, and fees on these loans. Moreover, her credit has been harmed, raising the cost of her car loan, and she has been subject to collections on her defaulted private student loan.

154.    Ms. Colon has established that SBI violated New York law.

155.    Under the terms of Ms. Colon's Master Promissory Notes, which include the

language mandated by the Holder Rule, Navient is subject to all claims and defenses that Ms. Colon could bring against SBI.

156.    Ms. Colon seeks a declaration that she has, pursuant to the terms of her promissory notes, established a defense to her repayment obligations such that her private student loans are not enforceable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Enter a declaration that Plaintiff Tina Carr's federal Direct Loans are not legally enforceable;

B.    Enter a declaration that Plaintiff Yvette Colon's federal FFEL loans are not legally enforceable;

C.    Enter a declaration that Plaintiff Yvette Colon's private student loans are not legally enforceable;

D.    Award attorneys' fees as authorized by law; and

E.    Grant such further relief as may be just and proper.

///

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/ *Eileen M. Connor*
Eileen M. Connor
Toby Merrill (application forthcoming)
Victoria Roytenberg (application forthcoming)
Amanda M. Savage (application forthcoming)
LEGAL SERVICES CENTER OF HARVARD LAW
SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
econnor@law.harvard.edu


Danielle Tarantolo
Jane Greengold Stevens
Shanna Tallarico
Jessica Ranucci (application forthcoming)
NEW YORK LEGAL ASSISTANCE GROUP
7 Hanover Square
New York, NY 10004
(212) 613-5000
dtarantolo@nylag.org


*Counsel for Plaintiffs*


Dated: November 12, 2017