## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TINA CARR and YVETTE COLON,<br><br>    Plaintiffs,<br><br>    v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of the U.S. Department of Education; NAVIENT CORPORATION; NAVIENT SOLUTIONS LLC; NAVIENT CREDIT FINANCE CORPORATION; SALLIE MAE BANK; EDUCATIONAL CREDIT MANAGEMENT CORPORATION; JOHN DOE TRUST #1, f/k/a "Sallie Mae Education Trust"; JOHN DOE TRUST #2, a/k/a "Navient Federal Loan Trust"; JOHN DOE TRUST #3, a/k/a "Deutsche Bank ELT Navient & SLM Trusts," a/k/a "Deutsche Bank ELT SLM Trusts"; JOHN DOE TRUST #4, a/k/a "Bank of NY ELT SLMA Trusts"; and JOHN DOE INC. a/k/a "Navient,"<br><br>    Defendants. | Case No.: 17-cv-8790<br><br><br>**AMENDED COMPLAINT FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      Plaintiffs Tina Carr and Yvette Colon borrowed student loans from the United States Department of Education (the Department) and private lenders to attend Sanford-Brown Institute (Sanford-Brown or SBI), a notoriously abusive for-profit college operated by Career Education Corporation (CEC) in New York.

2.      Sanford-Brown grossly misrepresented its career training programs and Plaintiffs' employment prospects to induce Plaintiffs to enroll, remain enrolled, and later enroll in further programs. Plaintiffs did not receive any of the promised benefits of attending Sanford-Brown, and in fact, their careers and lives have been severely harmed by their attendance and the crushing student loan debt that resulted from it.

3.     The Office of the Attorney General of the State of New York (OAG) found that Sanford-Brown systematically made the same types of false and deceptive representations to other prospective students that it made to Plaintiffs, in violation of New York consumer protection law.

4.     The promissory notes that Plaintiffs signed when they borrowed student loans to attend Sanford-Brown give them the right to assert claims based on Sanford-Brown's misconduct against the Department and the entities that hold their loans.

5.     Plaintiffs invoked this right to cancellation of their loans by submitting to Defendants evidence of Sanford-Brown's misconduct. But to date Defendants have refused to recognize Plaintiffs' right to have their defenses considered, and have instead asserted an unfettered right to collect from Plaintiffs.

6.     Plaintiffs are experiencing harm from these unlawful loans in the form of damaged credit and actual or threatened collections, including the possibility of future collection litigation.

7.     Plaintiffs therefore seek an immediate adjudication of their defenses to repayment of the loans in this forum.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to 20 U.S.C. § 1082(a)(2); 28 U.S.C. § 1331; 28 U.S.C. §§ 2201-2202; and 28 U.S.C. § 1367.

9.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)(B)-(C) because one of the Plaintiffs resides in this district, and because a substantial part of the events giving rise to these claims occurred in this district.

## PARTIES

**Plaintiffs**

10.     Plaintiff Tina Carr lives in Lindenhurst, New York. Ms. Carr borrowed federal student loans to attend a Medical Assisting program at Sanford-Brown's Melville, New York campus.

11.     Plaintiff Yvette Colon lives in New York, New York. Ms. Colon borrowed federal and private student loans to attend a Non-Invasive Cardiovascular Technology (Sonography) program at Sanford-Brown's New York, New York campus.

**Defendant DeVos**

12.     Defendant Elisabeth DeVos (the Secretary) is the Secretary of the United States Department of Education.

13.     In her official capacity, the Secretary oversees all operations of the Department and the administration of federal student loan programs, including the Federal Family Education Loan (FFEL) and Direct Loan programs, and has the ultimate duty and power to collect, discharge, cancel, settle, or compromise federal student loans. Specifically, the Secretary's duties and powers include:

a)     dictating the form and content of federal student loan Master Promissory Notes;

b)     issuing student loans through the Direct Loan program;

c)     approving the participation of lenders, including Sallie Mae Education Trust, in the FFEL program;[1]

d)     determining which schools and programs are eligible to receive federal student loan proceeds;

---

[1] No new loans can be made under the FFEL program, effective July 1, 2010. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-151, § 2201 *et seq.,* 124 Stat. 1074 *et seq*. (2010).

e) collecting on federal student loans held by the Department, including collecting on defaulted loans through litigation, garnishment of wages, offset of public benefits, and seizure of federal income tax refunds;

f) entering into and approving contracts with student loan servicers, such as Defendant Navient Solutions LLC, and private collection agencies in order to collect on federal student loans;

g) setting standards for and supervising the collection of federal student loans held by other entities; and

h) specifying in regulations when federal student loan borrowers may assert school misconduct as a defense to repayment.

14. The Department, under Defendant DeVos, currently holds Ms. Carr's Direct Loans.

15. Ms. Colon borrowed federal loans under the FFEL Program.

16. Under the FFEL Program, private lenders made federal student loans ("FFEL loans") to students, and guaranty agencies insured these funds. The guaranty agencies were, in turn, reinsured by the federal government.

17. Private FFEL lenders may assign and/or transfer FFEL loans to other entities, so long as adequate notice is provided to borrowers. *See* 34 C.F.R. § 682.208(e). When a borrower defaults, the FFEL loan holder may transfer the loan to and demand payment from the guaranty agency. The guaranty agency must continue efforts to collect on the defaulted loan. The guaranty agency may and, in some cases, must transfer the FFEL loan to the Department, which retains ultimate responsibility for the loan.

18. Any entity that holds a FFEL loan may contract with a loan servicer. FFEL loan

4

servicers must meet standards set by the Department. *See, e.g.*, 34 C.F.R. § 682.416(f).

19.     The Department, under Defendant DeVos, has ultimate responsibility for Ms. Colon's FFEL loans.  The Department, under Defendant DeVos, has the right to assignment of, and ultimate repayment on, Ms. Colon's FFEL loans, and has the duty to ensure the collection of these loans in accordance with the Higher Education Act ("HEA").

**Private Defendants Responsible for Ms. Colon's Federal (FFEL) Student Loans**

20.     The HEA mandates that, to the extent possible, a guaranty agency acting within the FFEL program shall ensure that a borrower only have one lender, one holder, one guaranty agency, and one servicer with which to maintain contact. *See* 20 U.S.C. § 1092c(b).

21.     Despite exercising due diligence, Plaintiff Colon is unable to identify the present holder(s) of her FFEL Loans.

22.     On information and belief, one or more of Defendants Navient Corporation, Navient Solutions LLC, Educational Credit Management Corporation, John Doe Trust #1, John Doe Trust #2, John Doe Trust #3, and John Doe Trust #4 is the holder of Ms. Colon's FFEL loans.

**John Doe Trust #1, f/k/a "Sallie Mae Education Trust"**

23.     Defendant John Doe Trust #1 is a trust of unknown identity formerly known as "Sallie Mae Education Trust."

24.     Sallie Mae Education Trust originated Ms. Colon's FFEL student loans.

25.     Ms. Colon's FFEL promissory notes identify the lender as "Sallie Mae Education Trust."

26.     On information and belief, Sallie Mae Education Trust was at some point affiliated with SLM Corporation (commonly called "Sallie Mae"). In its 2007 Form 10-K filed

with the United States Securities and Exchange Commission, SLM Corporation described Sallie

Mae Education Trust as an "internal lender brand" marketed by SLM Corporation's sales force.

27.     On September 9, 2006, an entity that identified itself both as "Sallie Mae

Servicing" and "Sallie Mae" sent a letter to Ms. Colon identifying the "Lender" of one of her

FFEL loans as "Sallie Mae Education Trust."

28.     On information and belief, Sallie Mae Education Trust is not a currently existing

legal entity.

29.     John Doe Trust #1 is the currently-operating successor in interest to Sallie Mae

Education Trust.

30.     Ms. Colon has never been notified of the transfer or assignment of her FFEL

loans to any other entity.

**Navient Corporation**

31.     Defendant Navient Corporation is a Delaware corporation with its principal place

of business located at 123 Justison Street, Wilmington, Delaware 19801.

32.     Navient Corporation was formed in April 2014 when SLM Corporation split into

two legal entities: Navient Corporation and the "new" SLM Corporation. In the 2014 split,

Navient Corporation assumed non-lending businesses of the "old" SLM Corporation and

assumed liability for much of the pre-split conduct of the "old" SLM Corporation. The "new"

SLM Corporation maintains a lending business.

33.     On information and belief, Navient Corporation assumed liability for Ms. Colon's

FFEL loans, either from Sallie Mae Education Trust, its successor, or the "old" SLM

Corporation.

34.     In its 2016 Form 10-K filed with the United States Securities and Exchange

Commission, Navient Corporation stated that it "holds the largest portfolio of education loans insured or federally guaranteed under the [FFEL] Program," worth $87.7 billion as of December 31, 2016.

35.     Ms. Colon's credit report shows the creditor for her FFEL loans as "Navient."

**John Doe Trust #2 a/k/a "Navient Federal Loan Trust"**

36.     Defendant John Doe Trust #2 is a trust of unknown identity also known as "Navient Federal Loan Trust."

37.     The Navient.com website portal for student loan borrowers identifies the "Lender" of Ms. Colon's FFEL loans as "NAVIENT FEDERAL LOAN TRUST."

38.     On information and belief, Navient Federal Loan Trust is not a currently existing legal entity.

**John Doe Trust #3, a/k/a "Deutsche Bank ELT Navient & SLM Trusts," a/k/a "Deutsche Bank ELT SLM Trusts"**

39.     Defendant John Doe Trust #3 is a trust of unknown identity also known as "Deutsche Bank ELT Navient & SLM Trusts" and "Deutsche Bank ELT SLM Trusts."

40.     The National Student Loan Data System ("NSLDS") is a federal government database that federal student loan borrowers can access to view the status of their federal student loans.

41.     The borrower-facing NSLDS interface, available to Ms. Colon, identifies the "current lender" and "loan contact" for all four of Ms. Colon's FFEL loans as "Deutsche Bank ELT Navient & SLM Trusts," located at 11600 Sallie Mae Dr., DEB Southerland, Reston, VA 20193.

42.     The NSLDS interface available to the Department identifies "Deutsche Bank ELT SLM Trusts" as the current lender for two of Ms. Colon's four FFEL loans.

7

43.     On information and belief, neither Deutsche Bank ELT & SLM Trusts nor Deutsche Bank ELT SLM Trusts is a currently existing legal entity.

44.     Navient Solutions, LLC stated in a federal court filing that "'Deutsche Bank ELT & SLM Trusts' is a generic term used to identify loans administered by [Navient Solutions LLC] and held in any of a number of securitized trusts."

**John Doe Trust #4, a/k/a "Bank of NY ELT SLMA Trusts"**

45.     Defendant John Doe Trust #4 is a trust of unknown identity also known as "Bank of NY ELT SLMA Trusts."

46.     The NSLDS interface available to the Department identifies "Bank of NY ELT SLMA Trusts" as the current lender for two of Ms. Colon's four FFEL loans.

47.     On information and belief, Bank of NY ELT SLMA Trusts is not a currently existing legal entity.

**Educational Credit Management Corporation**

48.     Defendant Educational Credit Management Corporation is a Minnesota nonprofit corporation with its principal place of business located at 111 Washington Avenue South, Minneapolis, MN 55401.

49.     Educational Credit Management Corporation is the guaranty agency for Ms. Colon's FFEL loans.

50.     On March 20, 2017, Educational Credit Management Corporation transmitted through the Navient.com website portal a letter to Ms. Colon stating that she was behind on her payments and at risk of default, and instructing Ms. Colon to call Educational Credit Management Corporation for loan repayment assistance.

51.     On May 16, 2017, an entity that identified itself both as "Navient Collections"

and "Navient" transmitted through the Navient.com website portal a letter to Ms. Colon titled "FINAL NOTICE" stating that she was at risk of default and that if she defaulted, her loans "will be transferred to the guarantor."

**Navient Solutions LLC**

52.     Defendant Navient Solutions LLC is a Delaware limited liability company with its principal place of business located at 123 Justison Street, Wilmington, Delaware 19801.

53.     Navient Solutions LLC was formerly known as Navient Solutions Inc.

54.     Navient Solutions LLC is a wholly-owned subsidiary of Navient Corporation.

55.     On information and belief, Navient Corporation and Navient Solutions LLC have significantly overlapping corporate governance and management, including that many officers serve in the same role at both corporations. On information and belief, Navient Corporation and Navient Solutions LLC each often use the name "Navient." For example, both companies utilize the website www.navient.com.

56.     NSLDS identifies Navient Solutions LLC as the servicer of Ms. Colon's FFEL loans.

57.     On April 24, 2015, the Office of the Customer Advocate for "Navient" reviewed and responded to Ms. Colon's submission asserting her defense to repayment with respect to her FFEL loans.

58.     On information and belief, the "Navient" Office of the Customer Advocate is part of Navient Solutions LLC.

59.     Ms. Colon's credit report shows the creditor for her FFEL loans as "Navient."

60.     On information and belief, Navient Solutions LLC regularly appears in court on behalf of entities that are or have been known as "Sallie Mae Education Trust," "Navient Federal

Loan Trust," and "Deutsche Bank ELT & SLM Trusts." *See, e.g.*, *Bannister v. U.S. Dep't of Educ., et al.* (*In re Bannister*), No. 15-01418 (Bankr. S.D.N.Y.); *Brown v. Deutsche Bank ELT Navient & SLM Trusts* (*In re Brown*), No. 17-00320 (Bankr. D. Md.); *Wenz v. Navient Federal Loan Trust et al.* (*In re Wenz*), No. 9:17-01088 (Bankr. C.D. Cal.).

61.     On information and belief, Navient Solutions LLC acts with legal authority over John Doe Trusts #1-3.

**Private Defendants Responsible for Ms. Colon's Private Student Loans**

62.     Despite exercising due diligence, Plaintiff Colon is unable to identify the present holder(s) of her private loans.

63.     On information and belief, one or more of Defendants Navient Corporation, Navient Solutions LLC, Sallie Mae Bank, Navient Credit Finance Corporation, and John Doe Inc. is the holder of Ms. Colon's private student loans.

**Sallie Mae Bank**

64.     Sallie Mae Bank is a Utah corporation with its principal place of business located at 175 South West Temple, Salt Lake City, Utah 84101.

65.     Sallie Mae Bank originated Ms. Colon's private student loans.

66.     One of Ms. Colon's two private student loan promissory notes identifies the lender as "Sallie Mae Bank Murray, Utah." The other promissory note does not identify a lender.

67.     The co-signer notices issued with respect to both of Ms. Colon's private student loans identify the lender as "Sallie Mae Bank."

68.     Sallie Mae Bank was a subsidiary of the "old" SLM Corporation that existed until 2014 and remains a subsidiary of the "new" SLM Corporation.

69.     Ms. Colon has never been notified of any transfer or assignment of her private

student loans to any other entity.

**Navient Corporation**

70.     On information and belief, in the 2014 split of the "old" SLM Corporation,

Navient Corporation assumed liability for Ms. Colon's private student loans from Sallie Mae

Bank or its successors.

71.     In its 2016 Form 10-K filed with the United States Securities and Exchange

Commission, Navient Corporation stated that it "hold[s] the largest portfolio of Private

Education Loans," worth $23.3 billion as of December 31, 2016.

**Navient Credit Finance Corporation**

72.     Defendant Navient Credit Finance Corporation is a Delaware corporation with its

principal place of business located at 2001 Edmund Halley Drive, Reston, VA, 20191.

73.     Navient Credit Finance Corporation was formerly known as SLM Education

Credit Finance Corporation, NM Education Loan Corporation, and SLM Education Credit

Management Corporation.

74.     Navient Credit Finance Corporation is the sole member of Navient Funding LLC

(formerly known as SLM Funding LLC) and Navient Credit Funding LLC (formerly known as

SLM Education Credit Funding LLC).

75.     The Navient.com website portal for student loan borrowers identifies the

"Lender" of Ms. Colon's private student loans as "NAVIENT CREDIT FINANCE CORP."

**Navient Solutions LLC**

76.     On information and belief, Navient Solutions LLC retained Central Credit

Services LLC to collect on Ms. Colon's private student loans.

77.     On information and belief, Navient Solutions LLC retained Northstar Location

Services LLC to collect on Ms. Colon's private student loans.

78.    On information and belief, Navient Solutions LLC retained National Enterprise Systems, Inc. to collect on Ms. Colon's private student loans.

79.    On at least sixteen occasions between November 2014 and February 2017, Central Credit Services LLC, Northstar Location Services LLC, and National Enterprise Systems, Inc. represented to Ms. Colon in writing that the "Current Creditor" on her private student loans was "Navient Solutions Inc." (the former name of Navient Solutions LLC).

80.    On three occasions between September and November 2017, Central Credit Services LLC represented to Ms. Colon in writing that the "Current Creditor" on her private student loans was "Navient Solutions LLC."

81.    On information and belief, Navient Solutions LLC is the servicer of Ms. Colon's private student loans.

**John Doe Inc. a/k/a "Navient"**

82.    John Doe Inc. is a corporation of unknown identity also known as "Navient."

83.    On information and belief, John Doe Inc. retained multiple collection agencies to collect on Ms. Colon's private student loans, including Central Credit Services LLC, Northstar Location Services LLC, and Asset Recovery Solutions, LLC.

84.    On five occasions between May 2016 and December 2017, Central Credit Services LLC, Northstar Location Services LLC, and Asset Recovery Solutions, LLC represented to Ms. Colon in writing that the "Current Creditor" on her private student loans was "Navient."

85.    On August 19, 2016, Jonathan Casey of the Office of the Customer Advocate for "Navient" wrote a letter to Ms. Colon stating that Ms. Colon's private student loans were

12

"Navient-owned."

86.     Ms. Colon's credit report shows that the current creditor on her private student loans is "Navient."

## FACTUAL ALLEGATIONS

### *Tina Carr's Enrollment at Sanford-Brown*

87.     After spending over two decades working as a professional musician, Ms. Carr moved from Los Angeles to New York in 2008 to help take care of her mother, who had been diagnosed with cancer.

88.     Participation in her mother's treatment led Ms. Carr to consider a second career in the medical field.

89.     At the time, Ms. Carr had only her high school diploma and a few college credits.

90.     Ms. Carr decided to obtain a professional license in the medical field, with the ultimate goal of becoming a registered nurse. As a first step, she decided to become credentialed in medical assisting, then gain additional hands-on work experience before pursuing further professional studies.

91.     She considered a number of programs offered by different institutions in her area, including ones offered at public, nonprofit schools.

92.     Ms. Carr first became aware of SBI's Medical Assisting program in early 2011 through a radio advertisement, which touted SBI's success in placing its graduates in relevant jobs.

93.     To learn more about SBI's program at the Melville location, Ms. Carr visited SBI's website. The information there reinforced the job placement information promoted in SBI's radio advertisement, and also advertised SBI's "Career Placement Assistance Services"

13

and its "career-focused education."

94.     On January 26, 2011, Ms. Carr went to SBI for what she thought would be an admissions interview.

95.     Instead, she met with an SBI admissions representative who promoted SBI to Ms. Carr. The SBI representative told Ms. Carr that if she studied hard, there was "a promise of employment" as a medical assistant.

96.     The SBI representative told Ms. Carr that Sanford-Brown had an approximately 80 percent job placement rate, and that placement rates for diligent students were even higher.

97.     The 80 percent job placement rate that the SBI representative stated to Ms. Carr was completely fabricated.

98.     The actual placement rate for SBI-Melville graduates in 2009-2010, shortly before Ms. Carr enrolled, was 26.1 percent.

99.     Ms. Carr told the SBI representative that she hoped to pursue a degree as a registered nurse after she had completed the Medical Assisting program and had worked as a medical assistant.

100.     The SBI representative told Ms. Carr that she would secure a job as a medical assistant, and that once she did, her future employer would likely pay for her further education, including a bachelor's degree and nursing school.

101.     The SBI representative failed to disclose to Ms. Carr that SBI's credits were not transferable to most public and non-profit degree-granting educational institutions.

102.     The SBI representative's pitch was intended to, and did, make Ms. Carr think that if she attended SBI, she would find a job as a medical assistant, and that she could later transfer her SBI credits to other institutions to pursue future studies to become a registered nurse.

103.    The SBI representative's statements convinced Ms. Carr to enroll in SBI's Medical Assisting certificate program, rather than in a Medical Assisting program at any of the other schools Ms. Carr had considered.

104.    Ms. Carr began her coursework at Sanford-Brown in March 2011.

105.    During Ms. Carr's attendance, the Campus Director of Education repeated unfounded claims that SBI would place students in jobs after they completed their coursework.

106.    After Ms. Carr had been in the program for approximately three months, SBI representatives encouraged Ms. Carr to switch to the Medical Assisting associate degree program, telling her that it would provide better career opportunities. The associate degree program was longer and more expensive than the Medical Assisting certificate program in which she initially enrolled.

107.    SBI representatives told Ms. Carr that she would earn more, and could earn up to $60,000 per year as a medical assistant with an associate degree and that Ms. Carr's externship experiences would lead to a permanent job. Ms. Carr borrowed additional loans in order to complete the associate degree program.

108.    Both of these representations were false.

109.    In order to attend Sanford-Brown, Ms. Carr borrowed six federal Direct Loans totaling $14,576. Ms. Carr executed Master Promissory Notes for these loans.

110.    Ms. Carr obtained these loans in reliance upon SBI's assurance that she would obtain a well-paying job upon graduation and its misrepresentations as to its job placement rates and the transferability of its credits.

111.    SBI made misrepresentations and material omissions to Ms. Carr regarding the school's ability to place graduates in jobs, the salary she would earn in such jobs, the support it

would provide her in securing post-graduate employment, and the transferability of SBI credits to other programs. On information and belief, the SBI representatives who made these representations knew or should have known that they were false, and nonetheless made the representations to induce Ms. Carr to enroll at Sanford-Brown and remain enrolled.

112.   Ms. Carr graduated from SBI in October 2012 with an associate degree in Medical Assisting.

113.   Despite graduating with a 4.0 grade point average, Ms. Carr was not able to get a job after her externships. Ms. Carr sought the promised job placement assistance from Sanford-Brown's career services staff, but they did not help her to secure even a single interview.

114.   Ms. Carr diligently conducted her own job search, but could not find employment with her Sanford-Brown credential.

115.   Since attending Sanford-Brown, Ms. Carr has never been able to obtain a job as a medical assistant, or any other job in the medical field.

116.   After months of searching unsuccessfully for employment as a medical assistant, Ms. Carr began to apply for jobs outside of her field. Ms. Carr experienced a period of homelessness and needed a steady source of income. In late 2013, she was hired as a seasonal cashier at J.C. Penney, where she worked for almost four years.

117.   Ms. Carr had high hopes for her future career prospects when she first began attending Sanford-Brown. She proudly told her friends and relatives that she was embarking on a new career. But when Ms. Carr was unable to find a job after finishing her degree, she experienced severe psychological trauma. She withdrew from her friends and relatives, and was unable to function normally. Ms. Carr remained in this traumatized state for months.

118.   Ms. Carr's federal loans have gone into default because she has been unable to

afford payments. Her loans have an outstanding balance of $18,590.

119.    Saddled with debt she cannot pay and a degree she cannot use, Ms. Carr has experienced homelessness, and has seen her credit ruined and her car repossessed.

### Yvette Colon's Enrollment at Sanford-Brown

120.    After working in the medical field for many years as a medical assistant and receptionist, Ms. Colon sought to advance her career by becoming a cardiac sonographer.

121.    In 2006, Ms. Colon sought to enroll in a cardiac sonography program. Ms. Colon had been advised by a colleague to be careful in choosing a program because not all schools offering such programs are accredited.

122.    Ms. Colon met with an SBI representative at SBI's New York, New York campus to ask whether the program was accredited for cardiac sonography. The SBI representative said "Oh yes, we are accredited." The representative pointed to a plaque on the wall, which had the word "accredited" on it.

123.    SBI's representation that its sonography program was accredited was false. In fact, SBI's sonography program lacked the necessary programmatic accreditation that would allow Ms. Colon to work as a sonographer. This program did not have, and never had, the required accreditation.

124.    Ms. Colon met with another SBI representative who told her that, after the program, she would definitely get a job as a sonographer and would earn $50,000 to $60,000 per year. These representations were false.

125.    The industry-standard American Registry for Diagnostic Medical Sonography (ARDMS) test is a *de facto* requirement for employment in the field of sonography. To take the exam, applicants must either graduate from a course with programmatic accreditation (the

accreditation that SBI's program lacked), or work in the field for one year—which SBI's graduates could not do because employers were unwilling to hire individuals who had not passed the ARDMS exam. According to the OAG, graduates of SBI's sonography program thus faced a "'[c]atch 22,'" in that most employers require certification, but without the programmatic accreditation, the only other path to certification requires a year of employment. *In re* Career Educ. Corp., AOD No. 13-379, Assurance of Discontinuance (Aug. 19, 2013) (Assurance), at 10-11.

126.   Ms. Colon decided to enroll in SBI's Non-Invasive Cardiovascular Technology (Sonography) certificate program based on the representatives' statements that the program was accredited and that she would definitely be able to get a job as a sonographer after graduation.

127.   Ms. Colon began coursework at Sanford-Brown in New York City in September 2006.

128.   During Ms. Colon's enrollment at SBI, SBI representatives told her that her credits would transfer to an associate degree program.

129.   Toward the end of her first year, Ms. Colon and her classmates heard that graduating students were unable to sit for the ARDMS certification examination. Alarmed, Ms. Colon's classmates raised their concerns with the Director of Sanford-Brown's Non-Invasive Cardiovascular Technology Program. The Director assured Ms. Colon and her classmates that their program was in the process of obtaining accreditation—and that even if it did not, Ms. Colon and her classmates' upcoming internships would lead to ultrasound jobs, which would make them eligible to take the certification examination after one year of work in the field. Based on these assurances, Ms. Colon decided to remain enrolled.

130.   Ms. Colon completed two externships while enrolled at Sanford-Brown, neither of

which led to a job. Ms. Colon was part of the first, and—because of its lack of training—last, Sanford-Brown cohort to extern at New York University. Her supervisor repeatedly commented on the Sanford-Brown externs' poor preparation for clinical work.

131.   In April 2008, Ms. Colon graduated from Sanford-Brown with a certificate in Non-Invasive Cardiovascular Technology (Sonography).

132.   When she attempted to register for the ARDMS exam, ARDMS informed her that she could not sit for the exam because she had not graduated from an accredited sonography program.

133.   Although Ms. Colon diligently searched for a sonography job, no employer would hire her unless she passed the ARDMS exam.

134.   Ms. Colon called Sanford-Brown regularly for months to ask if they knew of any available jobs, but in all that time they gave her only one referral to a job interview. It did not lead to a job offer.

135.   Ms. Colon could not find work in the cardiac sonography field. She eventually returned to a job in medical billing.

136.   In 2008, Ms. Colon tried to transfer her credits to the Borough of Manhattan Community College (BMCC), but BMCC informed her that the credits would not transfer because SBI's program did not have the right accreditation.

137.   The Sanford-Brown representatives' repeated promises that Ms. Colon's credits were transferable were false.

138.   SBI representatives made misrepresentations to Ms. Colon regarding the sonography program's accreditation, job placement assistance, and transferability of credits. On information and belief, the SBI representatives who made these representations knew or should

have known that they were false, and nonetheless made the representations to induce Ms. Colon
to enroll at Sanford-Brown and remain enrolled.

139.     To attend Sanford-Brown, Ms. Colon borrowed from Sallie Mae Bank four FFEL
loans, totaling $14,838, and two private loans, totaling $21,095.

140.     At the time of Ms. Colon's attendance, "Sallie Mae" was a preferred lender of
FFEL loans for CEC, the parent company that operated SBI.  "Sallie Mae" refers to subsidiaries
and entities related to the "old" SLM Corporation, including Sallie Mae Bank.

141.     CEC dictated all of SBI's financial aid and admissions practices.

142.     Pursuant to this preferred lending relationship, SBI referred its students, including
Ms. Colon, to Sallie Mae for both FFEL and private loans. SBI led Ms. Colon to believe that
private loans from Sallie Mae were the only option for her to fund the cost of her program not
covered by federal loans.

143.     This preferred lending relationship benefited Sallie Mae by giving the company
near-exclusive access to a large volume of risk-free federal student loans. It also benefited SBI,
because in order to obtain preferred lender status, Sallie Mae agreed with CEC to offer subprime
private student loans to students at CEC schools, including SBI.

144.     These subprime private loans helped SBI meet the federal requirement that, as a
for-profit school, it derive at least 10 percent of its revenue from sources other than federal
student aid (the "90/10" rule). *See* 20 U.S.C. § 1094(a)(24).

145.     Meeting the "90/10" rule's requirement was difficult for SBI, because many of its
students could not afford even 10 percent of its high tuition out-of-pocket.

146.     In addition, Sallie Mae knew that many of the SBI students referred to Sallie Mae
to borrow private loans would default on those loans because of the low graduation and

employment rates of SBI students.

147.     In fact, Sallie Mae and CEC entered into a "recourse agreement," under which CEC was required to deposit 20 percent of proceeds of these loans directly into a Sallie Mae reserve account to mitigate Sallie Mae's expected losses from these loans.

148.     Ms. Colon borrowed in reliance upon SBI's misrepresentations as to its programmatic accreditation, the transferability of its credits, its assurance that she would obtain a well-paying job upon graduation, as well as SBI's later misrepresentations that her credits would transfer, her externship would lead to a job, and the program would become accredited in time for her to sit for the ARDMS exam.

149.     Ms. Colon has paid thousands of dollars on her federal and private loans.

150.     Ms. Colon's private loans are in default and are subject to active collections.

151.     As a result of carrying debt she cannot repay, Ms. Colon's dreams of owning a home have been dashed. Her credit has been severely damaged, and she was only able to obtain a car loan at a very high interest rate. She has never worked in the sonography field, and she relies on friends and family for financial support.

### Findings of SBI Misconduct by the Office of the Attorney General of the State of New York

152.     After conducting a years-long investigation into SBI's business practices, the OAG determined that SBI systematically made false and deceptive representations to prospective and enrolled students, in violation of the consumer protection provisions of New York General Business Law Sections 349 and 350.

153.     The OAG's investigation culminated in an Assurance of Discontinuance with CEC, the parent company that operated SBI.

154.     The OAG found that from approximately 2008 to 2011, CEC misrepresented

SBI's job placement rates, SBI's accreditation status, and the transferability of SBI credits—precisely the categories of misrepresentations that induced Ms. Carr and Ms. Colon to enroll and remain enrolled at SBI.

155.    On information and belief, the illegal conduct described in the Assurance, including misrepresentations and deception concerning job placement rates, transferability of credits, and programmatic accreditation occurred at relevant times prior to 2008.

156.    Ms. Carr and Ms. Colon were subject to the practices described in the OAG's findings.

157.    The OAG found that "CEC provided inaccurate and inflated placement rates to prospective and then current students" at SBI and other CEC schools. Assurance at 4. Specifically, the OAG found that

> [s]tudents choose to attend CEC and select particular programs at CEC in order to improve their employment opportunities. Accordingly, placement rate is an important factor in students' decision to enroll in and complete CEC programs. The placement rates for [CEC] New York schools disclosed to prospective and then current students during the period of 2009 through spring 2011 were significantly inflated, giving prospective students a distorted, significantly overly-favorable impression of CEC graduates' employment outcomes.

*Id.* at 6-7.

158.    The OAG found that SBI's New York, New York campus (where Ms. Colon attended) represented to students that it had a placement rate of 65.7 percent in 2008-2009, but the actual rate was 42.1 percent. *Id.* at 7.

159.    The OAG further found that SBI's Melville, New York campus (where Ms. Carr attended) represented to students that it had a 70 percent placement rate in the 2009-2010 cohort, but the actual rate was 26.1 percent. *Id.*

160.    The OAG found that CEC's schools, including SBI, used deceptive means to

inflate its job placement statistics, including counting students who worked at one-day health fairs as employed; requesting health companies to sponsor health fairs so that large numbers of CEC graduates could be considered employed; and placing false information regarding students' job responsibilities into student files so that students could be counted as employed within their field of study. *Id.* at 5-6.

161.    With respect to programmatic accreditation, the OAG found that

> CEC enrollment representatives failed to adequately disclose to prospective and current students that [certain health services] programs were not programmatically accredited; that graduates of these unaccredited programs could not sit for certain qualifying exams typically necessary for employment upon graduation; and that graduates' inability to sit for these exams could negatively affect their employment opportunities.

*Id.* at 11.

162.    With respect to transfer credits, the OAG found that "CEC enrollment representatives," including representatives at SBI, "fail[ed] to adequately disclose to prospective students that credits earned at CEC's nationally-accredited programs are unlikely to be accepted by most regionally accredited public non-profit degree granting educational institutions." *Id.* at 13.

163.    The OAG determined that these deceptive practices violated New York General Business Law Sections 349 and 350. *Id.* at 14.

164.    In accepting the Assurance, CEC agreed to pay over nine million dollars into a restitution fund. *See id.* at 36.

165.    On October 24, 2014, Ms. Colon, who enrolled in 2006, received a notice from the OAG that she was eligible for a restitution payment. Ms. Colon applied for restitution from this fund, and was awarded $3,094.93.

166.    Ms. Carr was eligible for a restitution payment under the terms of the Assurance,

but did not receive the notice.

**Defendants Are Subject to Plaintiffs' State Law Claims Against SBI**

167.     The terms of the promissory notes that Ms. Carr and Ms. Colon executed when they took out loans to attend Sanford-Brown allow them to assert state law claims based on SBI's misconduct against the entities that hold the loans.

168.     The Federal Trade Commission's longstanding Rule on Preservation of Consumers' Claims and Defenses (referred to as the "Holder Rule") prevents creditors from profiting from illegal consumer practices while insulating themselves from consumer claims and defenses against sellers.

169.     The Holder Rule allows consumers to raise seller-related claims against any holder of their credit agreements by requiring all covered entities, including for-profit colleges, to include the following language in every credit agreement:

> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

*See* 16 C.F.R. § 433.2; *see also* 40 Fed. Reg. 53,506, 53,524 (Nov. 18, 1975).

170.     Through the Holder Rule, a student loan borrower can assert against any holder of her private student loan any claim or defense that she could assert against her school.

171.     Ms. Colon's private student loan notes contain the Holder Rule language quoted above. This language allows her to assert SBI's misconduct against the holder of her private student loans.

172.     Federal student loan notes contain language modeled on the Holder Rule that gives a student loan borrower the right to assert her school's misconduct as a defense to

repayment of her student loan.

173.    Specifically, FFEL Master Promissory Notes (MPNs) provide:

If this loan is made by the school, or if the proceeds of this loan are used to pay tuition and charges of a for-profit school that refers loan applicants to the lender, or that is affiliated with the lender by common control, contract or business arrangement, any holder of this Note is subject to all claims and defenses which I could assert against the school. My recovery under this provision shall not exceed the amount I paid on this loan.

*See also* 34 C.F.R. 682.209(g).

174.    Ms. Colon's FFEL MPNs contain the above-quoted language, which allows her to assert SBI's misconduct against the holder of her federal student loans. Ms. Colon can also assert her defenses against Defendant DeVos because the Department of Education has the ultimate liability for FFEL loans, an ongoing obligation to collect FFEL loans, the ability to compromise and cease collection of FFEL loans, the ability to demand assignment to itself of FFEL loans, and the authority to discharge Ms. Colon's FFEL loans.

175.    Direct Loan MPNs provide:

In some cases, you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done. You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law.

*See also* 20 U.S.C. § 1087e(h); 34 C.F.R. 685.206(c)(1).

176.    Although FFEL and Direct Loan MPNs contain different language, the borrower's ability to assert defenses to repayment are coextensive. *See, e.g.*, 20 U.S.C. § 1087e(a)(1); 60 Fed. Reg. 37,768, 37,769 (July 21, 1995).

177.    Ms. Carr's Direct Loan MPNs contain the language quoted above, which allows her to assert SBI's misconduct against the Department, under the direction of Defendant DeVos,

the holder of her federal student loans.

178.    The language in the MPNs executed by Ms. Carr and Ms. Colon allows them to assert claims against the loan holders arising out of state law, including New York General Business Law § 349(a) and common law fraud.

179.    New York General Business Law Section 349(a) prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

180.    New York common law fraud prohibits any material misrepresentation or omission of fact made with knowledge of its falsity and with an intent to defraud, on which a plaintiff reasonably relies, that causes damage to the plaintiff.

***Plaintiffs' Need for Declaratory Judgment Relief***

181.    For nearly three years, Ms. Carr and Ms. Colon have asserted to Defendants that they have state law claims against Sanford-Brown that give rise to defenses to repayment of their student loans.

182.    Defendants have refused to consider the merits of Plaintiffs' defenses and have instead maintained that they have the right to collect on Plaintiffs' loans.

183.    On March 18, 2015, Ms. Carr asserted to the Department and its collection agency, FMS Investment Corporation, a complete defense to repayment of her federal loans based on Sanford-Brown's violations of New York law. Ms. Carr submitted a letter articulating her defense, a sworn affidavit setting forth the misconduct described above, and nearly 100 pages of exhibits, including OAG evidence documenting Sanford-Brown's misconduct.

184.    On April 10, 2015, the Department's Default Resolution Group responded to Ms. Carr's submission by stating that a school's misrepresentations could not provide a legal basis

for a borrower to be relieved of the obligation to repay her federal loans. The letter further stated that "Ms. Carr is responsible for repayment of this debt" and that she "may be subject to enforced collection actions including wage garnishment and lawsuit."

185.    At some point thereafter, the Department placed Ms. Carr's loans in a "stopped collection" status at the Department's sole discretion. The Department has taken no further action on Ms. Carr's submission. Interest continues to accrue on Ms. Carr's loans.

186.    On March 9, 2015, Ms. Colon asserted to the Department's Ombudsman and "Navient, P.O. Box 9500 Wilkes-Barre, PA 18773" complete defenses to the repayment of her FFEL loans based on Sanford-Brown's violations of New York law. Ms. Colon submitted a letter articulating her defense, a sworn affidavit setting forth the misconduct described above, and over 100 pages of exhibits, including OAG evidence documenting Sanford-Brown's misconduct.

187.    On April 24, 2015, "Navient" responded to Ms. Colon's federal loan submission by stating that her FFEL loans could only be forgiven upon death or disability, or a school's closure. The letter further provided various options for repayment, deferment, and forbearance. On information and belief, this letter was sent by Navient Solutions LLC.

188.    On June 19, 2017, "Navient" placed Ms. Colon's FFEL loans in a one-year administrative forbearance at its discretion. This forbearance will end on June 18, 2018. Interest continues to accrue during the forbearance period.

189.    The Department has repeatedly delayed implementation of a final rule that would guide the Department's processing of borrower defense claims on non-defaulted loans. *See* U.S. Department of Education, Notification of Partial Delay of Effective Dates, 82 Fed. Reg. 27,621 (June 16, 2017); U.S. Department of Education, Interim Final Rule, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D.

Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 82 Fed. Reg. 49,114 (Oct. 24, 2017); U.S. Department of Education, Final Regulations, Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, William D. Ford Federal Direct Loan Program, and Teacher Education Assistance for College and Higher Education Grant Program, 83 Fed. Reg. 6458 (Feb. 14, 2018) (further delaying effective date to July 1, 2019).

190.    On February 5, 2016, Ms. Colon raised the same grounds to Navient Solutions LLC as a complete defense to repayment of her private loans under the terms of her promissory notes and federal law.

191.    On August 19, 2016, "Navient" responded to Ms. Colon's private loan submission and stated that it would "make no comment on whether Ms. Colon is entitled to relief from repayment of her Navient-owned private student loans based on the FTC Holder Rule." It stated that FTC Holder Rule "claims and defenses must be asserted and proven with competent evidence in an appropriate legal action." On information and belief, this letter was sent by Navient Solutions LLC.

192.    Ms. Colon's private loans remain in default and subject to active collections.

193.    Plaintiffs have been, and continue to be, harmed by Defendants' failure to recognize their defenses to repayment.

194.    All of Ms. Carr's and Ms. Colon's loans remain on their credit reports, significantly harming their credit. This has impaired their ability to rent or buy homes and to buy cars.

195.    On information and belief, Defendants, in their capacity as loan holders and servicers, report loan information to national credit reporting agencies on a monthly

basis.  Defendants are required to do this for all federal loans by the Higher Education Act. *See* 20 U.S.C. § 1080a; 34 C.F.R. § 682.208(a).

196.    Defendants are reporting to credit reporting agencies about Ms. Carr's federal student loans on an ongoing basis.  Her credit report currently states that these loans are in "Collection" and "past due" status.  Ms. Carr's federal student loans were most recently reported on February 3, 2018.

197.    Defendants are reporting to credit reporting agencies about Ms. Colon's FFEL loans on an ongoing basis. Her credit report currently states that these loans were up to 180 days delinquent. Ms. Colon's FFEL loans were most recently reported on January 31, 2018.

198.    Defendants are reporting to credit reporting agencies about Ms. Colon's private loans on an ongoing basis.   Her credit report currently states that these loans are in "charge-off" status, which is a term used for loans that are so seriously delinquent and unlikely to ever be collected as to have been "written off" by the creditor for accounting purposes. Ms. Colon's private loans were most recently reported on January 22, 2018.

199.    Because Defendants have asserted an unfettered right to payment on Plaintiffs' federal loans, Plaintiffs face the threat of resumed collection activity on these loans by Defendants at any time, including the threat of collection litigation.

200.    If and when Defendants resume collection on those loans, Plaintiffs will be forced to make payments on loans they assert they do not owe, attempt to negotiate a deferment or forbearance that temporarily relieves them of the obligation of making payments, or be in default on their loan obligations.

201.    When borrowers default on federal loans, they are subject to coercive collection mechanisms, including wage garnishment and tax offset. They are also subject to collections

litigation.

202.    Plaintiffs' federal loans have no statute of limitations. All of Plaintiffs' student

loans are presumptively non-dischargeable in bankruptcy.

203.    Without adjudication of their claims, Ms. Carr's and Ms. Colon's student loans

will follow them for the rest of their lives.

204.    Therefore, Ms. Carr and Ms. Colon seek declaratory relief establishing that they

have complete defenses to their repayment obligations.

## CAUSES OF ACTION

### *Count One,*
### *Against Defendant DeVos:*
### *Declaratory Judgment That Plaintiff Carr's Federal Direct Loans Are Unenforceable*

205.    Plaintiffs repeat and reallege each of the foregoing paragraphs, as if fully set forth

herein.

206.    SBI's conduct violated New York General Business Law Section 349(a) because:

   a)  SBI engaged in deceptive acts and practices in the conduct of its businesses;

   b)  SBI's conduct has had a broad impact on consumers at large;

   c)  SBI committed the deceptive acts and practices willfully and/or knowingly; and

   d)  SBI's wrongful and deceptive acts have caused injury and damages to Ms. Carr.

207.    SBI's conduct constituted common law fraud under New York law because:

   a)  SBI made material misrepresentations and omissions of fact with knowledge of

       their falsity;

   b)  SBI made such misrepresentations and omissions with intent to defraud;

   c)  Ms. Carr reasonably relied on SBI's misrepresentations and omissions of fact; and

   d)  Ms. Carr has suffered resulting damage.

208.    SBI's conduct toward Ms. Carr that violates New York General Business Law Section 349 and constitutes common law fraud includes, but is not limited to:

    a) SBI's representation to Ms. Carr that the job placement rate at SBI-Melville was 80 percent;

    b) SBI's representation to Ms. Carr that if she studied hard, there was "a promise of employment";

    c) SBI's failure to disclose to Ms. Carr that her credits were not transferable to most public and non-profit degree granting educational institutions;

    d) SBI's representation to Ms. Carr that she would earn more, and could earn up to $60,000 per year as a medical assistant with an associate degree; and

    e) SBI's representation to Ms. Carr that her externship experiences would lead to a permanent job.

209.    Ms. Carr has suffered damages from SBI's wrongful and unlawful conduct in an amount equal to or greater than the amount of money she has paid plus the outstanding principal, interest, and fees on these loans. Moreover, she has experienced homelessness, mental anguish, and trauma. Her credit has been severely harmed and her car repossessed.

210.    Under the terms of Ms. Carr's Master Promissory Notes, SBI's violations of New York law constitute a defense to repayment of Ms. Carr's federal student loans.

211.    Ms. Carr seeks a declaration that she has, pursuant to federal statute, regulation, and the terms of her Master Promissory Notes, established a defense to her repayment obligations such that her federal student loans are unenforceable.

***Count Two,***
***Against Defendants DeVos, Navient Corporation, Navient Solutions LLC,***
***Educational Credit Management Corporation, John Doe Trust #1, John Doe Trust #2, John***
***Doe Trust #3, and John Doe Trust #4:***

*Declaratory Judgment That Plaintiff Colon's Federal FFEL Loans Are Unenforceable*

212.    Plaintiffs repeat and reallege each of the foregoing paragraphs, as if fully set forth herein.

213.    SBI's conduct violated New York General Business Law Section 349(a) because:

   a)   SBI engaged in deceptive acts and practices in the conduct of its businesses;

   b)   SBI's conduct has had a broad impact on consumers at large;

   c)   SBI committed the deceptive acts and practices willfully and/or knowingly; and

   d)   SBI's wrongful and deceptive acts have caused injury and damages to Ms. Colon.

214.    SBI's conduct constituted common law fraud under New York law because:

   a)   SBI made material misrepresentations and omissions of fact with knowledge of their falsity;

   b)   SBI made such misrepresentations and omissions with intent to defraud;

   c)   Ms. Colon reasonably relied on SBI's misrepresentations and omissions of fact; and

   d)   Ms. Colon has suffered resulting damage.

215.    SBI's conduct toward Ms. Colon that violates New York General Business Law Section 349 and constitutes common law fraud includes, but is not limited to:

   a)   SBI's representation to Ms. Colon that its sonography program was accredited;

   b)   SBI's representation to Ms. Colon that she would definitely get a job as a sonographer;

   c)   SBI's representation to Ms. Colon that she would earn $50,000 to $60,000 per year as a sonographer;

   d)   SBI's representation to Ms. Colon that her externship experiences would lead to a

permanent job;

e)  SBI's representation to Ms. Colon that it would become accredited in time for her to sit for the ARDMS exam; and

f)  SBI's failure to disclose to Ms. Colon that her credits were not transferable to most public and non-profit degree granting educational institutions.

216.    Ms. Colon has suffered damages from SBI's wrongful and unlawful conduct in an amount equal to or greater than the amount of money she has paid plus the outstanding principal, interest, and fees on these loans. Moreover, her credit has been harmed, raising the cost of her car loan, and she has been subject to collections on her defaulted private student loans.

217.    Under the terms of Ms. Colon's Master Promissory Notes, SBI's violations of New York law constitute a defense to repayment of Ms. Colon's federal student loans.

218.    Ms. Colon can assert her defenses against the holder of her FFEL loans because the relationship between the lender and SBI meets one or more of the following criteria:

a)  Sallie Mae Bank and/or Sallie Mae was an organization affiliated with SBI;

b)  Sallie Mae Bank and/or Sallie Mae provided an improper inducement to SBI in connection with the making of the loan;

c)  SBI referred Ms. Colon to Sallie Mae Bank and/or Sallie Mae; and

d)  SBI is affiliated with Sallie Mae Bank and/or Sallie Mae by contract and/or business arrangement.

219.    Ms. Colon can also assert her defenses against Defendant DeVos because the Department of Education has the ultimate liability for FFEL loans, an ongoing obligation to collect FFEL loans, the ability to compromise and cease collection of FFEL loans, the ability to demand assignment of her FFEL loans, and the authority to discharge Ms. Colon's FFEL loans.

220.    Ms. Colon seeks a declaration that she has, pursuant to federal statute, regulation, and the terms of her Master Promissory Notes, established a defense to her repayment obligations such that her FFEL loans are not enforceable.

### Count Three,
### Against Defendants Navient Corporation, Navient Solutions LLC, Sallie Mae Bank, Navient Credit Finance Corporation, and John Doe Inc.:
### Declaratory Judgment That Plaintiff Colon's Private Loans Are Unenforceable

221.    Plaintiffs repeat and reallege each of the foregoing paragraphs, as if fully set forth herein.

222.    SBI's conduct violated New York General Business Law Section 349(a) because:

a)  SBI engaged in deceptive acts and practices in the conduct of its businesses;

b)  SBI's conduct has had a broad impact on consumers at large;

c)  SBI committed the deceptive acts and practices willfully and/or knowingly; and

d)  SBI's wrongful and deceptive acts have caused injury and damages to Ms. Colon.

223.    SBI's conduct constituted common law fraud under New York law because:

a)  SBI made material misrepresentations and omissions of fact with knowledge of their falsity;

b)  SBI made such misrepresentations and omissions with intent to defraud;

c)  Ms. Colon reasonably relied on SBI's misrepresentations and omissions of fact; and

d)  Ms. Colon has suffered resulting damage.

224.    SBI's conduct toward Ms. Colon that violates New York General Business Law Section 349 and constitutes common law fraud includes, but is not limited to:

a)  SBI's representation to Ms. Colon that its sonography program was accredited;

b)  SBI's representation to Ms. Colon that she would definitely get a job as a

       sonographer;

    c)  SBI's representation to Ms. Colon that she would earn $50,000 to $60,000 per

       year as a sonographer;

    d)  SBI's representation to Ms. Colon that her externship experiences would lead to a

       permanent job;

    e)  SBI's representation to Ms. Colon that it would become accredited in time for her

       to sit for the ARDMS exam; and

    f)  SBI's failure to disclose to Ms. Colon that her credits were not transferable to

       most public and non-profit degree granting educational institutions.

225.    Ms. Colon has suffered damages from SBI's wrongful and unlawful conduct in an amount equal to or greater than the amount of money she has paid plus the outstanding principal, interest, and fees on these loans. Moreover, her credit has been harmed, raising the cost of her car loan, and she has been subject to collections on her defaulted private student loan.

226.    Ms. Colon has established that SBI violated New York law.

227.    Under the terms of Ms. Colon's Master Promissory Notes, which include the language mandated by the Holder Rule, the holder of Ms. Colon's private loans is subject to all claims and defenses that Ms. Colon could bring against SBI.

228.    Ms. Colon seeks a declaration that she has, pursuant to the terms of her promissory notes, established a defense to her repayment obligations such that her private student loans are not enforceable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

    A.    Enter a declaration that Plaintiff Tina Carr's federal Direct Loans are not legally

enforceable;

       B.     Enter a declaration that Plaintiff Yvette Colon's federal FFEL loans are not legally enforceable;

       C.     Enter a declaration that Plaintiff Yvette Colon's private student loans are not legally enforceable;

       D.     Award attorneys' fees as authorized by law; and

       E.     Grant such further relief as may be just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

/s/ *Eileen M. Connor*

Eileen M. Connor
Toby Merrill (application pending)
Victoria Roytenberg
Amanda M. Savage
LEGAL SERVICES CENTER OF HARVARD LAW
SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
(617) 522-3003
econnor@law.harvard.edu


Danielle Tarantolo
Jane Greengold Stevens
Shanna Tallarico
Jessica Ranucci
NEW YORK LEGAL ASSISTANCE GROUP
7 Hanover Square
New York, NY 10004
(212) 613-5000
dtarantolo@nylag.org


*Counsel for Plaintiffs*


Dated: March 2, 2018